|  |  |
|---|---|
| UNITED STATES DISTRICT COURT | |
| DISTRICT OF PUERTO RICO | |

FERGIE DIAZ-AMIL,

    Plaintiff,

v.

BENJAMIN CINTRON-LEBRON in his individual and official capacity, and MUNICIPALITY OF PATILLAS

    Defendants.

Civil No. 10-1600 (JAF)

**OPINION AND ORDER**

Plaintiff sues alleging sexual harassment, discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to e-17. (Docket No. 1.) He also claims relief for the same conduct under the Puerto Rico Constitution, as well as unspecified Commonwealth employment and tort law.[1]  Codefendant Benjamín Cintrón Lebrón ("Cintrón") in his individual capacity moves for summary judgment under Federal Rule of Civil Procedure 56. (Docket No. 22.) In addition, his codefendants, the municipality of Patillas ("the Municipality") and Cintrón in his official capacity, have also moved for summary judgment. (Docket Nos. 19; 22.) Plaintiff opposes (Docket No. 34), and Defendants reply (Docket No. 38).

---

[1] In his motion of opposition (Docket No. 34), Plaintiff does briefly mention "Law 100" and Article 1802. See 29 L.P.R.A. § 149 (2009) ("Law 100"), and 31 L.P.R.A. § 5141 (2009) ("Article 1802").

I.

**Factual Synopsis**

At the outset, we note that after Defendants failed to properly contest the majority of Plaintiff's opposing statements of fact in their first reply, they submitted a supplementary reply, which offered improved denials and qualifications to selected statements of fact. (Docket No. 47.) This supplementary filing relies heavily upon an unsworn statement under penalty of perjury by Cintrón, created three days <u>after</u> the filing of Plaintiff's opposing statement of facts. (Docket No. 47-3.) This brief document barely exceeds one page in length but rebuts more than ten of Plaintiff's statements of fact with brief statements. Cintrón's unsworn statement, although self-serving, does contain relevant information of which he has first-hand knowledge and, thus, it proves competent to support summary judgment. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000). In fact, his affidavit so effectively creates genuine disputes of material facts, we are puzzled as to why Defendants even bothered to move for summary judgment at all. Nevertheless, we derive the following facts from the parties' motions, properly supported statements of uncontested material facts, and exhibits.[2] (Docket Nos. 19; 21; 22; 30; 31; 34; 35; 36; 37; 38; 40; 47.)

---

[2] Defendants also move to strike Plaintiff's opposing statement of material facts, (Docket No. 36), submitted in support of their opposition. (Docket No. 37.) Plaintiff opposes. (Docket No. 40.) We reject Defendants' argument that we should strike Plaintiff's opposition motion because, they argue, it fails to properly cite the record and thus runs afoul of Local Rule 56, which requires citations to the record. D.P.R.R. 56. We disagree and find that Plaintiff's brief reply complies with the rule for the most part, and we note that even if "a party opposing summary judgment fails to act in accordance with the rigors that such a rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) (citing Cosme-Rosado v. Serrano-Rodriguez, 360 F.3d 42, 45 (1st Cir. 2004)). Although Plaintiff will receive no credit for perfunctory denials with no record citations whatsoever, we will not strike his entire opposition.

Civil No. 10-1600 (JAF)                                                                                                      3

On June 1, 2004, Cintrón, the mayor of Patillas, appointed Plaintiff to a career position of municipal police officer in 2005. (Docket Nos. 21; 36; 36-1.) Plaintiff testified that Cintrón personally urged him to apply for a position with the municipal police and asked him to be assigned to his personal security detail. (Docket No. 36 at 1.) Cintrón denies this in his unsworn statement. (Docket No. 47-3.) Plaintiff first learned of Cintrón's sexual orientation through gossip in town. He testified he was at a private event when Cintrón had an altercation with his boyfriend, which Cintrón denies occurred in his unsworn statement. (Docket Nos. 18 at 1; 36 at 1; 47-3.) Plaintiff's direct supervisor, the police commissioner, issued three written reprimands in the Spring of 2005 for failure "to take service at the date, hour and place ordered." (Docket No. 21 at 1–2.) Plaintiff did not appeal these written reprimands. (Docket Nos. 18 at 5; 21 at 1–2.) In Plaintiff's performance evaluation for the first half of 2005, he received grades ranging from "A"s to "D"s. (Docket Nos. 21 at 2; 35 at 3.)

As part of Cintrón's security detail, Plaintiff testified that he was assigned an official police vehicle and picked Cintrón up for work and escorted him throughout the day, including nights and weekends. (Docket No. 21-1 at 50–52.) Plaintiff testified that he knew Cintrón's schedule and whereabouts because he acted as Cintrón's right-hand man at a certain point in time. (Docket No. 18 at 6.) Plaintiff testified that as part of the security detail, he had access to Cintrón's personal belongings, such as the pictures in Cintron's home, his wallet, and his cell phone.[3] (Docket No. 18 at 5–6.)

---

[3] Defendants mention Plaintiff's access to Cintrón's phone three different times as part of his security detail (Docket No. 18 at 5–6), in an attempt to insinuate that Plaintiff himself sent the texts, which were sent while Plaintiff was no longer part of the security detail. Regardless, we cannot play finder of fact at the summary-judgment stage.

Civil No. 10-1600 (JAF)                                                                                                    4

Although he could not recall the specific date, Plaintiff testified that Cintrón's first unwelcome sexual approach occurred in early 2006, when Cintrón told him that he wanted to go to bed with him, and Plaintiff testified that he rejected the advance. (Docket No. 36 at 2.) Cintrón denies this incident and all other incidents involving a sexual approach or proposition in his unsworn statement. (Docket No. 47-3.) After the alleged sexual advance, Cintrón took him off his personal security detail and assigned him to work the graveyard shift at a Municipality parking lot. (Docket No. 36 at 2.) Plaintiff understood this transfer to the night shift of parking lot guard duty to be retaliation, but felt that he "had to do his job" and so did nothing about it. (Docket Nos. 18 at 7; 21-1 at 54.)

Plaintiff testified that the second incident occurred around August of 2006 in Cintrón's official vehicle, when he told Plaintiff, "I like you, I want to be with you." No one else was in the car. (Docket No. 21-1 at 59–61.) Cintrón cursorily denies this in his unsworn statement. (Docket No. 47-3.) Plaintiff testified that when he rebuffed this advance, Cintrón threatened to fire him, write him up for abandonment of service, and prevent him from getting another job. Plaintiff testified that Cintrón later came to Plaintiff's house, "drunk and belligerent and yelling curse words." (Docket Nos. 36 at 2; 21-1 at 59–61.) Cintrón also denies this in his unsworn statement. (Docket No. 47-3.)

Plaintiff testified that in 2006, he visited the office of the municipal police commissioner to complain in person.[4] According to Plaintiff, the commissioner "refused to take his complaint" and told Plaintiff that "[Cintrón] is like that. Don't pay any attention to him, he is like that." (Docket No. 36 at 2.) Plaintiff also testified that the commissioner also refused to listen to any

---

[4] Plaintiff testified that after his unsuccessful meeting with the commissioner, Plaintiff did not file a written complaint. (Docket No. 21-1 at 71.)

Civil No. 10-1600 (JAF)                                                                                                        5

of the voice messages left by Cintrón in his voicemail because he didn't want to have to "take action" against Cintrón. (Id.; Docket No. 21-1 at 68–69.) Defendants object, and produce a sworn statement by the former commissioner denying that this meeting occurred. (Docket Nos. 47; 47-4.) Although the record contains inconsistencies as to the precise date, Plaintiff resigned from the force at some point in 2006.

Plaintiff testified that a year after his resignation, Cintrón sent an aide to him with an apology and a request to return to work for the municipality in the security surveillance unit, and the former agreed to take the job "on the condition that the Mayor would not disrespect him or his family." (Docket Nos. 21 at 3; 36 at 3.) Unsurprisingly, Cintrón denies this in his unsworn statement. (Docket No. 47-3.) Plaintiff testified that, at the time, he did not feel "forced" to work with Cintrón and that he was thankful for the employment opportunity; he declined a job offer at Wal-Mart because he preferred to work for the Municipality.[5] (Docket No. 21 at 3.)

On June 11, 2007,[6] Plaintiff signed a document indicating that he received an orientation on four different documents regarding municipal regulations and policies, including governmental ethics and procedures for corrective measures, but no mention was made of a harassment policy. (Docket Nos. 21 at 2; 21-7.) He began working as a clerk in the surveillance unit without any incidents. (Docket No. 36 at 3.) He was promoted the following year on July 22, 2008, when Cintrón appointed Plaintiff to the post of Supervisor of

---

[5] The parties disagree as to whether Cintrón himself offered Plaintiff the job, or whether the evaluation committee and the human resources director recommended plaintiff for the position. Regardless, he was the only applicant for the position. (Docket Nos. 21 at 3; 36 at 6; 35 at 4.)

[6] Plaintiff testified that he began working for the Municipality again on June 7, 2007. (Docket No. 18-1 at 96.)

Administrative Services,[7] where Plaintiff would supervise the surveillance center. The position had a trial or "probation period" —for training and evaluation before officially naming Plaintiff to the post—that expired on September 30, 2008. (Docket No. 21 at 3.) Plaintiff testified that shortly after his promotion, Cintrón "approached him in the City Hall and told him, 'Negro, see I gave you the position, now you're going to go to bed with me.' Plaintiff refused" and Cintrón sent him threatening text messages, telling him, "You're going to pay." Cintrón denies this incident in his unsworn statement and says he never sent Plaintiff any text messages. (Docket No. 47-3.) Cintrón subsequently reassigned Plaintiff again to a graveyard shift. (Docket No. 36 at 3.)

The general elections in Puerto Rico took place on November 4, 2008, and local regulations disallow changes in, inter alia, employee appointments, transfers, demotions, or salary during the two months prior to elections until "the second Monday of January after said elections." (Docket Nos. 21 at 4; 30-12 at 2.) Plaintiff's trial period as supervisor of the surveillance center was set to expire "during the electoral ban" on changes in employee classifications. (Docket No. 21 at 4). Cintrón notified him via letter that his trial period had been interrupted by the elections and that it would be extended for three months after the electoral ban ended.[8] (Docket Nos. 21 at 4; 30-12 at 2.)

Plaintiff testified that in December of 2008, Cintrón told him, "I gave you the productivity [end-of-year] bonus, and now you're going to bed with me," and Plaintiff told

---

[7] On May 28, 2008, the Municipality released a job announcement for the position of supervisor of administrative services; the announcement states the Municipality's policy against discrimination because of sex. The announcement also states that the trial or probation period lasts for only three weeks. (Docket Nos. 21; 21-9.)

[8] Plaintiff admits that he did not mention or challenge the extension of the trial period.

Civil No. 10-1600 (JAF)                                                                                              7

Cintrón that he was being disrespectful but then went on vacation—he took family leave from December 22, 2008, to January 30, 2008. (Docket No. 36 at 3.) Again, Cintrón denies that he made any sort of proposition in his unsworn statement. (Docket No. 47-3.) Plaintiff testified that Cintrón told him he could "forget about his job when he came back from vacation," that he would be fired, and that "he would pay." (Id.; Docket No. 21-1 at 113–14.) Cintrón does not deny this in his unsworn statement. Like the three previous incidents of alleged harassment, no one else was present so there were no witnesses. (Docket No. 21-1 at 97, 104.) For reasons disputed by the parties, Plaintiff did not receive his paycheck for the latter half of December for weeks past the normal pay period. (Docket Nos. 21 at 5; 21-1 at 113–14; 21-18; 36 at 3.)

Plaintiff testified that in January and February of 2009, Cintrón sent him several threatening and hostile text messages, including: "you better resign," "forget about your pay," "today you are working a double shift," "go to hell," "you are going for double shifts," "double shifts until you pay," "take care going into the museum of city hall," and "worker one."[9] (Docket No. 36 at 10.) Cintrón, in his unsworn statement under penalty of perjury, denies this, by stating that he "never sent text messages to [Plaintiff.]" (Docket No. 47-3.)

Plaintiff testified that after the alleged incident he did, in fact, work graveyard and double shifts during this time, which he understood to be retaliation for his refusal of Cintrón's advances. (Id.) Cintrón does not deny this. On February 5, 2009, Plaintiff and his brother-in-

---

[9] "Worker one" refers to a lower position than that Plaintiff held at the time; the position paid less and was transitory, as opposed to career. (Docket No. 36 at 5.)

Civil No. 10-1600 (JAF)                                                                                              8

law were walking on the street, when Cintrón—in his official vehicle—accosted them, yelling curse words and insults at Plaintiff.[10] Cintrón does not deny that this incident occurred either.

While Plaintiff was away on family leave, Cintrón appointed Alex Solís ("Solís") on December 28, 2008, as temporary head of the surveillance center and requested a report from the latter on the center's operations. (Docket No. 21 at 4.) The following day, Cintrón, Solís, and other municipal officials, such as internal auditor Carmen Cruz ("Cruz"), inspected the center and issued a report.[11] (Docket No. 30-15.) The report of December 29, 2008, spoke of "numerous deficiencies" at the center, such as cameras that had been out of service for over a month, poor maintenance for the equipment, poor visibility for surveillance of important places, "low rotation of the cameras," and unauthorized personnel who had access to the electronic system. (Id.) Later that day, Cintrón requested in writing that Cruz conduct further investigation of the issues alleged in the report. (Id.)

On February 9, 2009, four days after Cintrón accosted him on the street, Plaintiff once again signed a document indicating that he received an orientation on four different documents regarding municipal regulations and policies; a harassment policy was not one of them.[12] (Docket No. 21 at 5.) The next day, the Municipality's Human Resources ("HR") Director sent Cintrón a letter stating that Plaintiff, as supervisor of the surveillance center, had failed to submit an evaluation of his employees and failed to sign off on vacations for his employees,

---

[10] Plaintiff and his brother-in-law testified that Cintrón called him a "cabrón," "hijo de la gran puta" and "pendejo" among other insults. (Docket Nos. 36 at 4; 36-10; 21-1 at 150–52.)

[11] The report bears the signatures of Solís and Cruz. (Docket No. 30-15.)

[12] However, one of the four documents, the Law of Autonomous Municipalities, provides for the filing of written complaints against a mayor for failure to comply with the laws and for immoral conduct and illegal acts. (Docket No. 21 at 5.) The Law of Governmental Ethics, a second document, also provides for the filing of a written complaint against the mayor for failure to comply with the law. (Id.)

Civil No. 10-1600 (JAF)                                                                                                       9

which led to problems with payment for their work. (Docket Nos. 21 at 6; 21-22.) On February 10, 2009, Cintrón issued a letter to all supervisors reminding them of their duty of strict compliance with the Municipality's norms and regulations. (Docket No. 21 at 6.) Subsequently, on February 20, 2009, the HR Director sent Plaintiff a letter, which stated that the employees under the latter's supervision were not registering the hours they worked electronically in accordance with HR's instructions. (Id. at 6.) At some point during his tenure as supervisor, Plaintiff also received a verbal reprimand from Solís. (Docket No. 18 at 6.)

On March 4, 2009, and March 20, 2009, Plaintiff received two evaluation forms signed by Cintrón with scores of "1.54" out of four. (Docket Nos. 21 at 6; 36 at 4; 21-1 at 122.) Plaintiff received scores of "1" (unsatisfactory) on every metric except for attendance and punctuality, where he received a "4" (excellent). (Docket Nos. 30-34; 30-25.) The parties dispute whether the poor evaluation scores resulted from his performance or from his refusal to entertain Cintrón's alleged advances. (Docket No. 21 at 6; 36 at 4; 36 at 4; 21-1 at 122.) On March 31, 2009, internal auditor Cruz issued a new report on the surveillance center's operations ("the audit report"). (Docket No. 21 at 6; 30-26.)[13] The ominous findings echoed

---

[13] The report alleged many examples of chaos, such as: Employees making unauthorized phone calls; "cameras 'off line' continuously;" employees performing functions unrelated to work, such as napping and snacking; lack of control over and organization of employee's shifts; unnamed unauthorized persons with access to facilities. Moreover, it contains three incidents involving Plaintiff: He failed to follow up with HR about his employees' vacations and so they ended up working without contracts or pay (although it does not explain why HR could not have contacted him or the contract-less employees); on "January 30, 2009, one (1) month and 27 days later, [Plaintiff] communicated a supposed administrative decision at the wrong time;" and a first-person account by Cruz regarding her February 27, 2009, visit to the center, when Plaintiff reportedly made disrespectful comments to her. (Docket No. 30-26.)

Civil No. 10-1600 (JAF)                                                                                          10

those in the December report, and Cruz concluded that Plaintiff was an inadequate supervisor, and recommended new supervision and other improvements.[14]

On April 3, 2009, Plaintiff received a letter signed by Cintrón, informing him that he had not passed the aforementioned evaluations, had failed his trial period because of his inefficient performance,[15] and would be transferred to a transitory (as opposed to career) position. (Docket Nos. 18 at 7; 21-1 at 137; 21 at 8; 21-28; 36 at 4.) The letter also informed him of his right to appeal this administrative decision to the Appellate Commission of the Human Resources, or "CASARH," the Spanish acronym. (Docket Nos. 21 at 8; 30-27.) He testified that on April 15, 2009, he was informed that he was being offered a transitory "Worker One" ("Trabajador I") position, and that he had one day to sign the contract; the position paid more than $900 less per month than his salary at the time, so he responded that he would think it over. (Docket No. 36 at 5.) Plaintiff testified that he had decided to accept the position because he had bills and child support to pay, but when he returned the following day "he was told by the personnel director that he no longer worked for the Municipality" and that the position had been given to someone else. (Id.) Defendants present a different account of the transitory position, submitting minutes that indicate he showed up too late to take the transitory position that day. (Docket No. 47-3.) The same day, Solís submitted a letter to all personnel in the surveillance office informing them

---

[14] Cruz also recommended other changes that Cintrón could implement such as to: Assign shift leaders, limit access to the electronic system, establish "clear attendance and daily work schedule norms," establish mealtimes, and ban personal use of equipment. (Docket No. 30-26.)

[15] Specifically, the letter notes that he failed to submit evaluations for his employees on time, and he had failed to sign off on the vacations for his employees, "and therefore, the employees continued to work with your approval," which generated "communication problems and distress." (Docket No. 30-27.)

Civil No. 10-1600 (JAF)                                                                                                  11

that Plaintiff no longer worked for the Municipality and could not enter the surveillance center. (Docket Nos. 36 at 5; 42-1.)

On April 24, 2009, Plaintiff submitted a letter objecting to the March evaluations, alleging—for the first time in writing—the incidents of sexual harassment by Cintrón, and requesting a reconsideration of the decision to terminate his employment.[16] (Docket Nos. 36 at 6; 36-21.) On April 24, 2009, Plaintiff's attorney notified Cintrón of the sexual harassment claims via certified letter. (Docket No. 36 at 6.) On April 27, 2009, Plaintiff submitted his pro-se appeal to CASARH, indicating on the form that he was an employee in a probation period that was denied; in his one-sentence statement of appeal he wrote that he wanted to be "evaluated fairly and reinstated."[17] (Id.) After his unsuccessful appeal, Plaintiff could not find work in Puerto Rico and testified that he was forced to move to the continental United States. (Docket Nos. 36 at 5.)

The Municipality has an official policy and regulations for dealing with sexual harassment complaints.[18] (Docket No. 18 at 3.) When questioned at his deposition about the existence of the Municipality's official sexual harassment procedure and policy ("the harassment policy"), Plaintiff responded, "They explain that [sort of policy] in all jobs."

---

[16] Cintrón denied receipt of the letter in an unsworn statement. (Docket No. 47 at 5.)

[17] This submission contains no mention of harassment, but as Plaintiffs note, the three-page CASARH "boilerplate" form has no blanks or questions regarding harassment. (Docket Nos. 21 at 8; 35 at 5; 30-28; 30-29.)

[18] In fact, Cintrón approved the harassment regulations policy in 2001, which conveniently contains a special article establishing an alternative procedure for when the mayor is the alleged harasser. (Docket No. 30-31 at 35.) The thirty-eight page harassment policy requires all complaints to be in writing. (Id.) The harassment policy also states that a copy of the policy "will be given to all unit chiefs" and should be posted on the bulletin board. (Docket No. 18 at 5.) Unfortunately, based on Plaintiff's uncontested testimony, it appears that these regulations were not self-executing and they were not given to him or posted.

Civil No. 10-1600 (JAF)                                                                                          12

(Docket No. 18 at 3.)  Plaintiff, however, testified that he was never shown the harassment policy, and that he saw it for the first time during the deposition. (Docket No. 36 at 5.)  He did not receive training regarding the harassment policy or procedures for filing a claim.  Although Plaintiff signed for the receipt of four documents regarding Municipal regulations or training, the harassment policy was not among them. (Id. at 6.)  Plaintiff admitted that he did not inquire into the harassment policy or ask for a copy of the regulations to learn the Municipality's legal procedures, but he did note that he was supposed to receive training about them. (Id.; Docket No. 21-1 at 162–63.)  Nor did Plaintiff know of the "special proceeding [sic] to follow when the allege [sic] harasser is the Mayor," which involves filing a complaint before the Municipal Legislature—Plaintiff never filed such a complaint with the legislature. (Docket Nos. 18 at 3; 21 at 9; 21-1 at 162–63.)  He did not file a complaint or his allegations in writing until 2009, but he testified that on the two occasions that he complained to his direct supervisor, the commissioner, he was not given any instruction on how to file such a claim.

On July 29, 2009, Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and received a right-to-sue letter from the EEOC on April 1, 2010.  Additionally, on May 11, 2010, the Puerto Rico Department of Justice issued its findings from its preliminary investigation into Plaintiff's complaint of sexual harassment, and found that while Cintrón did not commit a felony, he "committed the misdemeanor of sexual harassment, as typified in Article 146 of the Puerto Rico Penal Code." (Docket Nos. 36 at 6–7, 42-5; 47-2.)  Cintrón was never charged with criminal charges related to the investigation. (Docket Nos. 47; 47-3.)  The present case was filed on June 29, 2010. (Docket No. 1.)

**II.**

**Summary Judgment Under Rule 56**

We must grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if it could be resolved in favor of either party and "material" if it potentially affects the outcome of the case. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

The movant carries the burden of establishing that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The movant may satisfy this burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . or other materials." Fed. R. Civ. P. 56(c)(1)(A). Furthermore, to establish the absence of a genuine dispute of material fact, the movant need not produce evidence but may instead point to a lack of evidence supporting the nonmovant's case. See Fed. R. Civ. P. 56(c)(1)(B); see also Celotex, 477 U.S. at 325. "Once the moving party has made a preliminary showing that no genuine [dispute] of material fact exists, the nonmovant must produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy [dispute]." Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (internal quotation marks omitted); see also Fed. R. Civ. P. 56(c)(1).

In evaluating a motion for summary judgment, we must view the record in the light most favorable to the nonmovant. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150–51

Civil No. 10-1600 (JAF)                                                                                                14

(2000). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III.
### Analysis: The Municipality and Cintrón in His Official Capacity

We first consider the motion of summary judgment filed by the Municipality and Cintrón in his official capacity ("Movants"), who argue that they are entitled to summary judgment on all of Plaintiff's claims. (Docket No. 19.) We discuss each claim in turn, and for the reasons described below, we grant in part, and deny in part, their motion for summary judgment.

**A.   Title VII**

Because of the vast swaths of genuine disputes of material facts that litter our summary judgment record, our analysis more closely resembles that of a motion to dismiss. Thanks to the puzzling last-minute submission of Cintrón's unsworn statement denying most of Plaintiff's allegations, genuine disputes of material fact and credibility exist regarding the bulk of Plaintiff's allegations of harassment. Because a genuine dispute of fact remains regarding whether the incidents occurred and, thus, necessarily, whether and how Plaintiff responded to the alleged harassment, we reject the Movants' arguments regarding the Title VII harassment, hostile work environment, and retaliation claims. With the record before us, we are incapable of considering issues such as the severity of the harassment or whether or not retaliation for rebuffing Cintrón's sexual advances occurred given the genuine disputes of material fact over whether <u>any</u> of the harassment, protected activity or retaliation <u>occurred at all</u>.

We disregard Defendants' amusing argument that Plaintiff failed to exhaust administrative remedies because he failed to file an EEOC charge "<u>before</u> being fired from his

job." (Docket No. 22 at 6 (emphasis added).)  He was within the time prescribed by Title VII, since he filed his administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred.  42 U.S.C. §§ 2000e–5(e)(1).  Therefore, we reject Movants' arguments as to the Title VII claims.

**B.    § 1983**

"The Due Process Clause of the Fourteenth Amendment protects government employees who possess property interests in continued public employment." Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 134 (1st Cir. 2005).  Local law determines whether "public employees possess such a property right" by defining the "terms and conditions of the employment arrangement." Id. (citations and internal quotation marks omitted). Puerto Rico law categorizes public employees "into either career or trust/confidential positions." Id. (citing 3 P.R.L.A. § 1349).  "Unlike career employees, who are removable only for cause, trust employees . . . . [do] not have a constitutionally protected property interest in that position." Id. Plaintiff was terminated while he was still on his probationary period, and had not yet achieved career status, and as such he had no "constitutionally protected property interest in continued employment, and [he] cannot prevail on their due process claim under the Fourteenth Amendment." Figueroa-Serrano, 221 F.3d at 7; see also Febus-Cruz v. Sauri-Santiago, 652 F. Supp. 2d 140, 152 (D.P.R. 2009) ("Given that Febus had not yet achieved 'regular career employee' status at the time of his termination, Febus did not have a legally recognized expectation to continued employment when he was terminated."). Finally, Plaintiff does briefly hint at an Equal Protection claim (Docket No. 1), but does not develop any arguments, and he has not established that he falls within a protected class or that he was treated differently than

Civil No. 10-1600 (JAF)                                                                                                  16

others similarly situated. Ayala-Sepulveda v. Municipality of San German, 2012 U.S. App. LEXIS 947, at *18--19 (1st Cir. Jan. 18, 2012). And even if Plaintiff had argued that he was a class-of-one, "the class-of-one theory of equal protection has no application in the public employment context." Engquist v. Or. Dep't of Agric., 553 U.S. 591, 607 ( 2008). Thus, we dismiss Plaintiff's due process claim under the Fourteenth Amendment.

### C.   Supplemental Claims

Movants argue that we should dismiss Plaintiff's supplemental Commonwealth-law claims in light of their arguments for dismissal of the federal claims. But, as discussed above, we rejected those arguments, and we reject this one as well.

## IV.

### Analysis: Cintrón in his Individual Capacity

We next consider the separate motion for summary judgment filed by Cintrón in his individual capacity. (Docket No. 22.) Cintrón raises several arguments on the merits that we do not reach here, because of a far more basic defect. Plaintiff's method of service "was effective only as to the official-capacity claims, but it was not effective as to the individual-capacity claims." Crispin-Taveras v. Municipality of Carolina, 647 F.3d 1, 7 n.2 (1st Cir. 2011) (citing Perez-Sanchez v. Public Bldg. Auth., 531 F.3d 104, 106 (1st Cir 2008)). Neither Plaintiff's complaint nor the summons specifies whether Cintrón was being sued in his individual or official capacity, and Cintrón was served through the executive director of the Municipality. (Docket Nos. 1; 3.) Because we do not have proper personal jurisdiction over

Civil No. 10-1600 (JAF) 17

Cintrón in his individual capacity, we grant, but do not reach the merits of,[19] his summary judgment motion. (Docket No. 22.)

### IV.

### **Conclusion**

For the foregoing reasons, we hereby **GRANT IN PART and DENY IN PART** the Movants' motion for summary judgment. (Docket No. 19.) We **DISMISS** Plaintiff's Fourteenth Amendment claims under § 1983, but all of his other claims against the Municipality and Cintrón in his official capacity remain.

As discussed in our earlier short order, (Docket No. 61), we quash the *in personam* jurisdiction over Cintrón in his individual capacity because he was only served in his official capacity and, because we do not have proper personal jurisdiction over Cintrón in his individual capacity, we **GRANT** his summary judgment motion. (Docket No. 22.) We also **DENY** Defendants' motion to strike. (Docket No. 37.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 17th day of February, 2012.

                s/José Antonio Fusté
                JOSE ANTONIO FUSTÉ
                U.S. District Judge

---

[19] However, we note that, as discussed above in Part III.B., Plaintiff's constitutional claims under § 1983 cannot stand. We further note that even if Plaintiff were to cure the defective summons, Title VII does not support personal capacity claims. Fantini v. Salem State Coll., 557 F.3d 22, 28–31 (1st Cir. 2009).